SUBURBAN TRANSPORTATION SYSTEM, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20769.   Promulgated May 15, 1950.

*Maurice R. McMicken, Esq.*, and *Alfred J. Schweppe, Esq.*, for the petitioner.

*Irene F. Scott, Esq.*, and *Douglas L. Barnes, Esq.*, for the respondent.

828

OPINION.

LeMire, *Judge*: The petitioner qualifies as a corporation entitled to have its excess profits credit computed under section 713, Internal Revenue Code, on the basis of its average base period net income, having been in existence during all of the base period years 1936 to

1939, inclusive. It contends, however, that the computation of its excess profits tax by use of its excess profits credit based on income without the benefit of section 722 results in an excessive and discriminatory tax. It undertakes to establish what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income.

Petitioner contends, first, that the establishment of the new Haller Lake-Lago Vista route on November 13, 1939, was a change in the character of its business within the meaning of section 722 (b) (4) and that this was one of the causes which contributed to the inadequacy of its base period earnings as a standard of normal earnings. In its brief petitioner states that it is now limiting its claim under this issue to the establishment of the new route and is abandoning any claim on account of the extension of its services on its other routes.

Section 722 (b) (4) authorizes an adjustment of the base period net income where average base period net income is an inadequate standard of normal earnings because of a change in the character of the business. The term "change in the character of the business" is defined as including "a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation." The purpose of the second sentence in section 722 (b) (4), as indicated by the Commissioner's regulations and by the bulletin on section 722 (see Regulations 112, sec. 35.722–3, p. 139, and Bulletin on Section 722 of the Internal Revenue Code, Nov. 1944, pp. 86–87) is to establish the maximum earnings at the end of the base period to which the taxpayer can lay claim for the purpose of reconstructing its average base period net income for the entire base period. Thus, in cases where at the end of the base period the level of earnings ultimately resulting from the change had not been reached, this "push-back" method is used to determine what the maximum constructive earnings at the end of the period would be. They are then used in reconstructing earnings for all four of the base years. However, if the level of earnings resulting from the change had been reached before the end of the base period, no resort to the second sentence in section 722 (b) (4) is necessary. Instead, in that case, it is only necessary to take the earnings as they had leveled off after the change on or before the end of the base period and reconstruct the average base period income for all four years on that basis.

In *East Texas Motor Freight Lines*, 7 T. C. 579, we held that there was a change in the character of the taxpayer's business, within the meaning of section 722 (b) (4), where the taxpayer, a public carrier of freight by motor truck on established intrastate routes, added a new intrastate route and also new interstate routes, which increased

its mileage approximately one-third and opened up an entirely new type of operation. We said in our opinion:

We think the evidence before us clearly proves that "during * * * the base period" petitioner "changed the character" of its business. Prior to the acquisition of the three new routes from Dallas to Fort Worth, from Texarkana to Memphis, and from Memphis to St. Louis, petitioner was predominantly an intrastate carrier. Thereafter its business was that of an interstate carrier, as well as an intrastate carrier. These acquisitions not only added approximately 600 miles of additional territory to be served by petitioner, but opened up an entirely new type of operation, namely, the straight load or key point operation as distinguished from the old interchange or joint haul operation. Under this new type of operation petitioner was able to haul more freight at a considerable lesser cost per ton of freight hauled. This resulted in larger profits for petitioner. We think that these changes can reasonably be regarded as "a change in the operation * * * of the business, a difference in the * * * services furnished, [and] a difference in the capacity for * * * operation" as those terms are used in section 722 (b) (4) * * *.

The change in petitioner's business resulting from the establishment of the new Haller Lake-Lago Vista route was of considerable less scope than that of the taxpayers in the *East Texas Motor Freight Lines* case. The changes made by the petitioner did not call for any new type of equipment or operations and did not then, or later, result in any larger volume of business at less cost per mile or per fare. The figures given to us indicate that the increase in mileage was less than 10 per cent of petitioner's total mileage. The new route served the same general territory that petitioner was already serving. It supplemented the old Haller Lake-Lago Vista route, which had been in operation since 1928 and paralleled that route, only two blocks away, for a considerable distance. As affecting petitioner's total operations, it amounted to little more than the extension of the services on petitioner's old routes.

In its proposed reconstruction of base period net income petitioner seems to assume that the new Haller Lake-Lago Vista route, if it had been established two years earlier, would have yielded approximately the same return of income in 1938 and 1939 as its old established routes. That assumption is not justified on any evidence before us. Petitioner's secretary and general manager testified that this new territory had not been sufficiently developed to justify the inauguration of the new route before 1939 and that to have commenced it earlier would have meant only a longer period of operating losses. While it was the testimony of this witness that the development of a paying route ordinarily required two or three years, this can not be taken to mean that any new route might be expected to reach a paying basis within that time, regardless of the progress and development of the territory which it served. Petitioner's records show that the combined revenue from the new and the old Haller Lake-Lago Vista

routes in each of the years 1936 to 1939, inclusive, was less than the average per mile cost of operations on all of its combined routes. There is nothing in the evidence to show, and we can not assume, that the new Haller Lake-Lago Vista route would have been any more profitable at the end of the base period years had it been established two years earlier than it was.

We do not think that the evidence shows any error on the part of the respondent in refusing to make an adjustment under section 722 on account of petitioner's expansion of its services in 1939.

Petitioner next contends that it sustained a net loss on the operation of its new Haller Lake-Lago Vista route over the period November 13 to December 31, 1939, of $667.12, for which an adjustment should be made under section 722 (b) (5). In computing the amount of the alleged loss petitioner has taken the cost factor of 17.84 cents per mile which was the average cost per mile of its entire operations on all of its routes for the year 1939. No other evidence was offered as to the added cost of operating the new route or as to whether the revenue derived from it was more or less than the additional expenses.

Even accepting the fact that a loss such as claimed may have been realized on the operation of the new route for the period November 13 to December 31, 1939, it was not sufficient to cause any substantial distortion of petitioner's average base period net income. Section 722 (b) (5), under which petitioner's claim for this item is made, relates to "any other factor affecting the taxpayer's business which may *reasonably* be considered as resulting in an inadequate standard of normal earnings during the base period." (Italics supplied.) We do not think that the small loss which may have resulted in 1939 from the operation of the new route may reasonably be considered as resulting in an inadequate standard of normal base period earnings.

Petitioner next contends that it suffered a loss in 1936, 1937, and the first six months of 1938 on account of the loss of its mail contract, for which an adjustment should be made under section 722 (b) (4). This item was claimed originally under section 722 (b) (1). In this proceeding petitioner argues that the procurement of the mail contract on July 1, 1938, was a change in the operation of the business, within the meaning of subsection (b) (4), and that an adjustment should be made therefor under that subsection. According to petitioner's computation, this would result in an addition to base period income of $545.70 in 1936, $1,128.99 in 1937, and $583.29 in 1938.

We think that the procurement of the mail contract and the services performed thereunder constituted a change in the character of petitioner's business within the meaning of section 722 (b) (4). Carrying the United States mail under a term contract was an entirely different operation from carrying passengers for single trip fares. The mail

contract constituted only a small percentage of petitioner's business, it is true, but to that limited extent it was a change which had a direct effect upon petitioner's average base period net income.

Relief under section 722 (b) (4) is proper where the actual average base period income does not involve normal operations after the change has taken place. The adjustment requires the construction of a normal base period income for the entire base period, patterned on conditions as they existed after the change took place. Thus, the proper adjustment here would be to add to petitioner's net income for 1936, 1937, and 1938 the amount of net income which it would have derived from the mail contract, acquired on July 1, 1938, if it had held the contract during all of the base period. Since the evidence is that the additional expenses incident to handling the mail were negligible, the entire amount of the compensation received under the contract is the measure for the additions to be made to the base period net income. Petitioner actually received $545.70 for the last half of 1938 and $1,128.99 for the full year 1939. We think that the "fair and just amount representing normal earnings" would be arrived at by adding $1,128.99, a full year's compensation under the contract, to the net income for each of the years 1936 and 1937, and by adding to 1938 income so much as is required to bring the total compensation for that year to $1,128.99.

Petitioner's remaining contention is that it is entitled to an adjustment under section 722 (b) (4) on account of the loss resulting in 1936 and 1937 from the operation of the old type buses which had been replaced with the Tri-Coaches, computed as shown above in our findings of fact, by comparing the costs of operating the new and the old type buses. The adjustment sought results in additions of $6,454.92 and $2,880.05 to income for the respective base period years 1936 and 1937.

In its brief petitioner states:

Petitioner realizes that it might be questionable whether the replacing of its old type buses with Tri-Coach equipment would be a change in the character of the business contemplated by section 722 (b) if that were the only claim being made by petitioner for adjustment under said section. However, since other of its claims under said section will require a computation of a constructive average base period net income for petitioner, it is believed that such excess cost of operating the old type equipment in those two years should be taken into consideration.

Each separate claim must of course rest on its own merits. Because an adjustment may or may not be required on one ground does not affect the taxpayer's right to an adjustment on some other ground.

Petitioner computes its alleged loss on the basis of what it would have saved had it replaced all of its old type buses with Tri-Coaches at the beginning of 1936. In other words, petitioner claims to have lost what it might have saved by a complete change. We agree with petitioner's suggestion that, standing alone, the addition of the Tri-

Coaches did not result in a change in the petitioner's business within the meaning of section 722 (b) (4). There was no change in the "operation or management" of the business, nor was there any difference "in the products or services furnished" or "in the capacity for production or operation." The most that petitioner claims for the Tri-Coaches is that they were more convenient to operate and more economical than the old type buses. They performed the same services as the old buses in substantially the same manner and on the same routes. There is no proof that the use of the Tri-Coaches resulted in any increase in the number of passengers carried or in petitioner's gross revenue.

The mere addition of new and improved equipment to replace that in use or to meet expanding business is not a change such as contemplated by section 722 (b) (4). That is a common occurrence within the normal operation of many types of business.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*