CHARIS CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 18441. Filed April 30, 1954.

*Colman B. Stein, Esq.,* and *S. Walter Kaufman, C. P. A.,* for the petitioner.

*Jules I. Whitman, Esq.,* for the respondent.

**OPINION.**

Bruce, *Judge:* Petitioner is entitled to use the excess profits credit based on income pursuant to section 713, Internal Revenue Code. It contends, however, that the computation of its excess profits tax by use of its excess profits credit based on income without the benefit of section 722 results in an excessive and discriminatory tax. It undertakes to establish three distinct changes in the character of its business which might qualify it for relief under section 722 (b) (4).[1] It also undertakes to establish what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income.

### Introduction of the Swavis Garment.

Petitioner contends, first, that the introduction of the Swavis line was "a difference in the products or services furnished," which quali-

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. * * *

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * *

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. * * *

fies as a "change in the character of the business" within the purview of subsection (b) (4). There can be no doubt that a difference in the products or services furnished may occur through the addition of a new product. But, in order for a taxpayer to qualify for relief under subsection (b) (4) because of either "a difference in the products or services furnished" or "a change in the operation or management of the business," it must show that the change was substantial as measured by two basic tests which are set forth in respondent's Bulletin on Section 722, at pages 48 and 50, and quoted with approval in *Central Produce Co.*, 18 T. C. 267, 274:

(i) The nature of the operations must be essentially different after the change from the nature of the operations prior to the change; and

(ii) There must be a higher level of earnings which is directly attributable to the change.

We shall consider these tests in the order named to determine whether or not the alleged "change" was substantial.

For the addition of a new product to result in an essential difference in the nature of the taxpayer's operations, such addition must represent more than a usual or customary event in the type of business in which the taxpayer is engaged. Cf. *Permold Co.*, 21 T. C. 759, where the taxpayer during its corporate life had produced a variety of cast aluminum products, switching from one to another. See also *Triangle Raincoat Co.*, 19 T. C. 548. The addition must ordinarily represent more than the addition of a new product to a line of varied products. Cf. *Stonehard Co.*, 13 T. C. 790. Moreover, the added product must be substantially different from the product or products previously furnished; mere improvement is not sufficient. Cf. *Pelton & Crane Co.*, 20 T. C. 967; *Avey Drilling Machine Co.*, 16 T. C. 1281.

The introduction of the Swavis garment did not represent a usual or customary event in petitioner's business. From its inception petitioner had produced only a rigid type corset. From 1926 it had produced only the Charis garment for women with problem figures. The addition of the elastic Swavis garment in 1935 for women without problem figures was an unusual innovation in petitioner's business. Petitioner's competitors had also added this type of garment, but in each case it represented an unusual event in their corporate life, as the selling of candy and popcorn was a novel, yet fairly universal, innovation in the business of theatre operators. Cf. *Jefferson Amusement Co.*, 18 T. C. 44, 61. Also, the introduction of the Swavis line was not an addition to a varied line of products. Prior to 1935 only the Charis type garment was produced by petitioner.

It is respondent's contention that the Swavis garment was not an essentially different product, but a mere improvement on the Charis garment. He argues that the Swavis garment merely repre-

sented a more suitable substitute for that portion of petitioner's customers who purchased it. We have not found this to be the case. The Swavis garment was a new product designed primarily for an entirely different class of women from those using the Charis garment.

Recognition has been given to both the differences and the similarities between the Swavis and Charis garments and we find that the differences outweight the similarities. Cf. *Stonehard Co., supra,* at p. 795. The following are the principal differences between the two garments. They do not have the same consumer market as they are not suited to the same type of women. One is used to mold the figure while the other is used to smooth out the dress line. Also, they are regarded as different by both the consumer and the industry. It is true that both are foundation garments and both are made by the same machines and personnel. But the difference is not merely one of style, color or design. The Swavis garment was designed for a different purpose, was sold to a different class of customers, and for the most part was made with a basically different material. Cf. *Pelton & Crane Co., supra.*

Respondent has set out the following test for determining whether an alleged new product or service must be deemed to constitute a difference in the products or services furnished, in his Regulations 112, section 35.722–3 (*d*) :

(2) A difference in the products or services furnished. A product or service is different from another product or service if the trade custom or practice treats it as a product or service of a different class.

The president of the Corset and Brassiere Association of America testified for the petitioner. He stated that the Swavis and Charis lines "* * * are in a different category of garments, as we would define them in the industry." Considering this testimony and other evidence, in our opinion petitioner has shown that it is a trade custom or practice to treat a Swavis type garment as a product of a different class from a Charis type. Therefore the addition of the Swavis garment constituted "a difference in the products or services furnished."

The facts in the instant case are similar to those in *7-Up Fort Worth Co.,* 8 T. C. 52. There the taxpayer was in the business of bottling a soft drink known as 7-Up. It obtained a franchise and began bottling a Nesbitt orange drink. The Nesbitt orange and 7-Up drinks were bottled with the same equipment in the same plant and were sold and delivered by the same personnel. The Nesbitt orange drink had less carbonation than 7-Up, was not especially adaptable as a "mixer" for alcoholic beverages, and its chief market was in homes and among young people. It competed with 7-Up, if at all, to a very limited extent. This Court there recognized a change in the character of the business. The addition of the Swavis line in the instant

case represented an equal, if not greater, difference in the products furnished.

Petitioner has demonstrated that the addition of the Swavis line brought about an essential difference or substantial change in the nature of its operations. But in order to constitute a qualifying change, the change must likewise be substantial in that as a direct result of the change the level of normal earnings of the business was increased materially over what such level would have been had the change not been made. Petitioner's gross sales of the Swavis garment were $333,925 in 1939. Since there was little, if any, competition between the Swavis and Charis lines, the addition of the new product did not cause a decrease in Charis sales and resulted in a proportionate increase in petitioner's earnings. As a direct result of the change petitioner's normal earnings were increased over what they would have been had the change not been made. It is immaterial that due to other causes petitioner's over-all earnings decreased after the change was made. The pertinent factor is that petitioner's base period earnings would have been considerably smaller than they were had the new product not been added. Cf. *Jefferson Amusement Co.*, *supra*, p. 57.

Respondent does not deny that the change was made "immediately prior to the base period" within the meaning of section 722 (b) (4). Therefore, the addition of the Swavis line qualifies as a change under that section.

### Change From Office to Home Fitting.

The shift from office fitting to home fitting does not qualify as a change in the character of the business within the purview of subsection (b) (4). Petitioner states in its brief that it "* * * does not contend that the change to home fittings would have increased Charis sales beyond the pre-home-fitting level * * *." In order to qualify for relief because of "a change in the operation or management of the business," the taxpayer must show that the change was substantial as measured by the two basic tests set out above. As was true in *Central Produce Co.*, *supra*, even if we assume that the change from office to home fitting resulted in an essential difference in the nature of petitioner's operations, the second basic requirement, that there must be a higher level of earnings which is directly attributable to the change, was not satisfied.

Petitioner has not demonstrated that if the shift to home fitting had been made 2 years earlier, its earning level would have been greater by the end of the base period than it would have been had it continued office fitting.

### Transfer of Company-Owned Branch Offices.

Petitioner's transfer of 8 of its retail offices to franchise distributors also does not qualify as a change within the purview of subsection (b) (4). During the base period there were 90 retail outlets for petitioner's products. At the beginning of the base period 78 were operated by franchise distributors and 12 were operated by petitioner. Petitioner discovered that it could increase its profits by transferring its company-owned outlets to franchise distributors. That is, the company-owned outlets would be operating at a loss if they paid the same price for the products sold as the franchise distributors. The franchise distributors were evidently more efficient than the managers of the company-owned outlets. Consequently, 7 company-owned outlets were transferred to franchise distributors in 1938 and 1 in 1939.

As we have previously indicated, in order for a change in the operation of the business to qualify under subsection (b) (4), the nature of the operations must be essentially different after the change from the nature of the operations prior to the change. Cf. Regs. 112, sec. 35.722-3 (d). In our opinion the nature of the operation of petitioner's business was not essentially different because 86.7 per cent of its outlets were operated by franchise distributors in 1936 and 1937, while 95.6 per cent of its outlets were operated by franchise distributors at the close of the base period. Merely the ownership, not the operation of the outlets, was changed by the transfer. The transfer of eight outlets to franchise distributors did not result in a significant change in petitioner's method of distribution. Cf. *A B C Brewing Corp.*, 20 T. C. 515, 536-7; *Jefferson Amusement Co., supra.*

The addition of the Swavis line qualifies as a change in the character of the business within the purview of subsection (b) (4). This, however, does not affect the determination of whether the shift from office fitting to home fitting or the transfer of eight outlets to franchise distributors also qualify as changes. In *Suburban Transportation System*, 14 T. C. 823, 832, we held that:

Each separate claim must of course rest on its own merits. Because an adjustment may or may not be required on one ground does not affect the taxpayer's right to an adjustment on some other ground.

Thus, each unrelated change must be viewed separately in order to determine whether it qualifies as a change within the purview of subsection (b) (4). Neither the shift from office to home fitting nor the transfer of eight company-owned offices so qualifies.

*Reconstruction.*

Having determined that petitioner has qualified under section 722 (b) (4), and having considered the corrective steps necessary in reconstructing petitioner's average base period net income, including adjustment for the qualifying factor, elimination of abnormal variations, and correction for growth or decline (Cf. E. P. C. 13, 1947-1 C. B. 83, 84; E. P. C. 42, 1949-1 C. B. 144) we have concluded that petitioner is entitled to a constructive average base period net income of $15,800 in excess of its average base period net income computed without regard to section 722.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*