STONHARD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 11419, 12396.   Promulgated November 21, 1949.

*Wentworth T. Durant, Esq., David V. Shapiro, Esq., and John Merrell, Esq.,* for the petitioner.

*William H. Best, Esq.,* and *Irene Scott, Esq.,* for the respondent.

OPINION.

Murdock, *Judge*: The petitioner is a domestic corporation which was in existence before January 1, 1940, and is, therefore, entitled to use the excess profits credit based on income pursuant to section 713 or the excess profits credit based upon invested capital pursuant to section 714, whichever amount results in a lesser tax. Sec. 712 (a). The statements attached to the notices of rejection indicate that the petitioner's excess profits credit based on invested capital was $4,700.87 for 1941 and $5,203.03 for 1942. The petitioner's base period was the years 1936 through 1939 and its excess profits credit based on its income for those years amounts to about $3,700 for 1941 and to about $4,500 for 1942. The credits under the invested capital method, being greater than the credits under the income method, must be used in computing this petitioner's excess profits tax for 1941 and 1942 unless one of the relief provisions of section 722 (b) applies. The petitioner claims relief in this proceeding solely under section 722 (b) (4).

The claim is that section 722 (b) (4) applies because the petitioner changed the character of its business during the base period by introducing Wetwal, Wax, and Stonpach, which represented a difference in the products furnished, and the average base period net income does not reflect the normal operation for the entire base period since the business did not reach, by the end of the base period, the earning level which it would have reached if the change in the character of the business had been made two years earlier.[1] The petitioner contends

---

[1] The table set forth in the findings of fact shows that the net income of the petitioner for each of the last three base period years and for 1940 was low in comparison with the net income for 1934, 1935, and 1936, but, as the petitioner concedes, the mere fact that the income for all or a portion of the base period was low does not entitle a taxpayer to relief under section 722 unless the pertinent facts as a whole bring that taxpayer within one of the relief provisions. *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220.

that $24,868.99 is a fair and just amount representing average normal earnings for the base period for the purpose of computing the excess profits credit based on income. It arrives at that figure by adjusting the 1939 sales of its old products to approximate those of 1936 on the ground that the 1939 sales were abnormally low because of customer resistance resulting from earlier confusion between the new product Stonpach and the old product Resurfacer; by adjusting the 1936 Wetwal sales to 75 per cent of the 1937 sales on the ground that the 1936 Wetwal sales would have been 75 per cent of the 1937 sales if the product had been introduced two years earlier; by adjusting the Stonpach sales for all of the base period years to 15 per cent of the domestic sales of the old products for each year on the ground that Stonpach sales never reached their normal level during the base period, and if the product had been introduced two years earlier the sales would have reached by December 31, 1939, the level of 15 per cent of the sales of other products; and by adjusting the net profits for each base period year to 4.3 per cent of the gross sales for that year as adjusted.

The first question is whether the petitioner changed the character of its business during the base period within the meaning of section 722 (b) (4) by the introduction of these three products. Did they represent a "difference in the products * * * furnished"? The evidence shows that the petitioner brought out Wetwal and Wax in 1936 and Stonpach in 1937. It had never previously marketed any product similar to Wax. The petitioner claims that the introduction of Wax gave it some entree to new customers. However, the sales of Wax were almost insignificant and the record fails to show that the introduction of Wax had any material effect upon the business of the petitioner. The petitioner was already marketing Bondite, a product somewhat similar to Wetwal, when it introduced the latter product. Likewise, there were similarities and also some differences between Stonpach and Concretite which the petitioner was marketing at the time Stonpach was brought out in 1937. Recognition has been given to the differences, as well as to the similarities, among these four products as shown by the evidence. The differences do not add up to a change in the character of the business within the meaning of section 722 (b) (4).

The petitioner from its inception was marketing a line of products which, generally speaking, were used in the maintenance of buildings and other construction work. It normally brought out new products from time to time and occasionally discontinued one. The 3 products, Stonpach, Wetwal, and Wax were not a closely related group of new products differing from the others. They were more closely related to old products than to each other. They were only 3 of 13 brought out during the base period. Wax was for the purpose of giving an old

product, Resurfacer, wider use. Wetwal was for the purpose of painting damp or moist surfaces. Bondite was another product used for that same general purpose. Stonpach was for the purpose of repairing concrete installations, particularly floors. Concretite was sold for a similar purpose, and Resurfacer, although different in composition, had, as one of its uses, the repair of floor surfaces, whether of concrete or some other material. The record does not show how the sales of Wetwal for any year compared with the sales of Bondite, how the sales of Stonpach for any year compared with the corresponding sales of Concretite or Resurfacer, or what the net profit or loss for any year was from the sales of any of these products. Sales of Stonpach, while larger than those of Wetwal, were with those of Wetwal and Wax only about 3 per cent of the total sales of the petitioner during the last 3 base period years. These 3 new products fitted into the general line of products being sold by the petitioner. They were not a departure from and did not represent any change in the character of the business carried on by the petitioner. They were several relatively small new products which the trade would recognize as mere additions to the line. They did not affect the type of customers solicited, open new markets, change the sales policies, affect manufacturing, or materially affect earnings, so far as this record shows. The business was the same after their introduction as before. The introduction of a few new products which fit into the line constituting the business and do not materially change that business does not represent "a difference in the products * * * furnished." Congress, in enacting section 722 (b) (4), contemplated a greater change than that shown in the present record by the introduction of these three products. H. Rept. No. 2333, 77th Cong., 2d sess., pp. 23, 24, 145, 146; S. Rept. No. 1631, 77th Cong., 2d sess., pp. 200–201. This conclusion completely defeats the petitioner's claim for relief as presented in this case. Cf. Regulations 112, sec. 35.722–3 (d).

The substantial change in the business which took place in the case of *Lamar Creamery Co.*, 8 T. C. 928, distinguishes that case. That company adopted new methods of merchandising, solicited and acquired new customers for the new product, and started quantity production of that product. The introduction of the new product changed the taxpayer from a small business operator to one of the largest in its area. No such conditions exist in the present case.

Furthermore, if the introduction of these three products could be regarded as a change in the character of the business of the petitioner within the meaning of section 722 (b) (4), still the record would not justify any relief. The petitioner argues that the 1939 sales of old products were abnormally low because of customer resistance resulting from earlier confusion between Resurfacer and Stonpach and

should be adjusted to approximate those of 1936. Not only did the petitioner fail to mention any such ground or partial ground for relief in its claims upon which the Commissioner acted (*Blum Folding Paper Box Co.*, 4 T. C. 795), but it also failed to introduce evidence to justify an over-all adjustment of 1939 sales. The petitioner's point seems to be that, while 1939 sales in certain industries which it feels are closest to its field were as great as or larger than the 1936 sales, its sales for 1939 were about $49,000, or approximately 10 per cent, less than its sales for 1936. This falls far short of a justification for adjusting the petitioner's sales for 1939 on the theory that they were not normal.

The only witness called was the treasurer of the petitioner. The attempt was made to prove through him and the statistical evidence offered that the falling off in the profits of the petitioner for the last three years of the base period was due to the introduction of these three new products. That is, the introduction of the products caused additional expense for the training of salesmen, for the time consumed in introducing these products, and for the cost of undue mistakes which occurred, and, furthermore, confusion between the new product Stonpach and the old product Resurfacer resulted in an increase in returns and allowances, and, after that confusion no longer existed, in sales resistance to the products of the petitioner because of the confusion. This witness testified exclusively in general terms and gave no examples, although pressed to do so. The decline in earnings started and a large increase in returns and allowances occurred before Stonpach was introduced. Confusion between Resurfacer and Stonpach might be expected to show up in returns of those products, but the record does not show the returns and allowances for any period on Resurfacer, and those on Stonpach were less percentagewise than those on all products. A finding has been made that there was some confusion between Resurfacer and Stonpach, but better evidence of the extent of that confusion and its effect upon earnings would be required before relief would be justified. There is no showing that the average sales per salesman did not actually increase. The table of sales and expenses set forth in the findings of fact shows that there were a number of different factors which tended to reduce the earnings during the last three years of the base period, which factors have nothing to do with those referred to by the witness. For example, the figures shown for research and development and those for expenses other than selling and service expenses could alone account for the reduction in earnings. The drop in sales in 1939 was due to the loss of foreign markets and there was almost no decrease in domestic sales. The failure to consider and explain these and other possible factors affecting earnings seriously weakens the witness' statement that the decline in 1939 sales was due to the "confusion" which he described.

The petitioner reasons that 1936 Wetwal sales would have been 75 per cent of the 1937 Wetwal sales if the product had been introduced two years earlier. Here again the evidence does not support the petitioner's contention. It does not show that the sales of Wetwal at the end of the base period had not reached the earning level which they would have reached if the product had been brought out two years earlier. There is no evidence as to what, if anything, the earnings were from this product. There was not a steady increase in sales of this product. The sales for 1939 were somewhat larger than they ever had been and there is no good reason advanced justifying the belief that the sales or earnings for 1939 would have been greater if the product had been introduced two years earlier.

The petitioner argues that Stonpach sales never reached their normal level during the base period, if the product had been introduced two years earlier sales would have reached a level of 15 per cent of the sales of other products by December 31, 1939, and the sales for all base period years should be adjusted to 15 per cent of the domestic sales of the old products. It gets the 15 per cent by comparing the Stonpach sales for 1947 ("after December 31, 1939") with the sales of other products for that year. Why that should be done does not clearly appear. This adjustment would mean that the sales of Stonpach for the base years should be adjusted so that they would range from about $56,000 for the low year to over $87,000 for the high year as compared to actual sales of Stonpach ranging from about $7,600 for the low year to slightly more than $14,000 for the high year. It can not be stated too emphatically that the record does not justify any such adjustments as these. Actually, the Stonpach sales fell off during the base period; also, the returns on Stonpach were less percentagewise than the returns on all products. The base period sales of Stonpach appear to have been about normal; at least the record offers no reason for a belief that they were less than normal. No figures are given for earnings on Stonpach and the record does not justify a finding that the earnings from the sales of Stonpach at the end of the base period had not reached the earning level which would have been reached if the product had been brought out two years earlier.

The next step in the petitioner's process of reconstructing a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purpose of the excess profits tax credit based on earnings is to take 4.3 per cent of the gross sales as adjusted for each base year in order to arrive at net profits for that year. The figure of 4.3 per cent is arrived at by comparing the net income for 1935 with the gross sales for that year. The petitioner reaches this conclusion, as well as others vital to its contention, too

cavalierly and without supporting evidence or persuasive reasoning. Not only does the record fail to justify the conclusion that the normal earnings for the base period would have been 4.3 per cent of the gross sales as adjusted, but it fails to indicate that there was any substantial difference between the actual earnings and normal earnings. The low actual earnings for the last three base period years, and the possibility that the earnings from these three new products for the base period years might possibly have been somewhat greater had they been brought out two years earlier, has not been overlooked. The evidence indicates that, if any increase in the earnings might have resulted from the earlier introduction of these three products, the increase would not have been great enough to have made the excess profits credit based on income under section 713 greater than the excess profits credit based on invested capital under section 714. Thus, in no event is the petitioner subjected to any obvious hardship by the denial of the claim for relief under section 722 (b) (4).

Reviewed by the Special Division.

*Decision will be entered for the respondent.*